# In the United States Court of Federal Claims

RAYTHEON COMPANY,

          Plaintiff,

      v.

THE UNITED STATES OF AMERICA,

          Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)

No. 19-883C
(Filed Under Seal: June 15, 2022 |
Reissued: June 30, 2022)

<u>Steven M. Masiello</u>, Dentons US LLP, Denver, CO, and <u>Gale R. Monahan</u>, Dentons US LLP, Dallas, TX, for Plaintiff.

<u>Domenique Kirchner</u>, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for Defendant, with whom were <u>Patricia M. McCarthy</u>, Director, and <u>Brian M. Boynton</u>, Acting Assistant Attorney General. <u>Catherine M. Parnell</u>, Trial Attorney, U.S. Department of Justice, Washington, DC, <u>Major Robert E. Wald</u>, Litigation Attorney, General Litigation Branch, U.S. Army Legal Services Agency, Fort Belvoir, VA, <u>Ethel O. Eady</u>, Litigating Attorney, and <u>William B. Haywood</u>, Patent Attorney, U.S. Army, Aviation & Missile Command Legal Department, Redstone Arsenal, Huntsville, AL, Of Counsel.

## OPINION AND ORDER[*]

**KAPLAN, Chief Judge.**

      Plaintiff Raytheon Company ("Raytheon") and the United States Army Contracting Command-Redstone ("the Army") are parties to a series of contracts involving the supply of engineering services in support of the Patriot weapons system. Under those contracts, beginning in 2012, Raytheon became obligated to provide vendor lists to the Army on a quarterly basis. Those lists identified the suppliers from which Raytheon had purchased parts for the missile system during the preceding two years.

      This case arises out of a dispute between the parties regarding whether the information on the vendor lists constitutes "technical data" within the meaning of Department of Defense Federal Acquisition Regulation Supplement ("DFARS") 252.227-7013(a)(15) (2015), which was

---

[*] This Opinion was originally issued under seal and the parties were given the opportunity to request redactions. Both parties notified the Court that they had no proposed redactions and the Opinion could be released in full. <u>See</u> ECF Nos. 124, 125.

incorporated into the engineering contracts.[1] In a 2018 Contracting Officer's Final Determination ("COFD"), the Army concluded that the information in the lists was technical data, instructed Raytheon to remove certain proprietary marks it had placed on the lists, and directed it to replace them with the markings for technical data subject to Government Purpose Rights, which are set forth at DFARS 252.227-7013(f)(2) (2015).

Raytheon filed this suit on June 17, 2019, requesting that the Court enter declaratory judgments that its vendor lists are not technical data as defined in DFARS 252.227-7013(a)(15) (2015), and that the COFD is void. See Compl. ¶¶ 66–80 (Counts III and IV), ECF No. 1. In the alternative, it seeks a declaratory judgment that the Army breached the contracts by allegedly failing to comply with the procedural requirements for challenging restrictive markings on technical data set forth in 10 U.S.C. § 2321 (2021) and DFARS 252.227-7037 (2016). See Compl. ¶¶ 49–65 (Counts I and II).

Presently before the Court is the government's motion for partial summary judgment, Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 59, and Raytheon's cross-motion for partial summary judgment as to Counts I–IV, Pl.'s Cross-Mot. for Summ. J. and Resp. in Opp. to Def.'s Mot. for Summ. J. ("Pl.'s Cross-Mot."), ECF No. 71.

For the reasons set forth below, the Court finds that the information on the vendor lists is not technical data within the meaning of DFARS 252.227-7013(a)(15) (2015). Accordingly, the government's motion for summary judgment is **DENIED**, and Raytheon's cross-motion seeking declaratory relief is **GRANTED** as to Counts III and IV. Because the Court has determined that the information on Raytheon's vendor lists is not technical data within the meaning of 10 U.S.C. § 2320 (2021) and DFARS 252.227-7013(a)(13) (2015), the procedures for challenging unjustified markings set forth in DFARS 252.227-7037 (2016) and 10 U.S.C. §§ 2320–21 (2021) do not apply. The claims in Counts I, II, and V, are therefore **DISMISSED** as moot.

---

[1] As a general matter, the version of procurement regulations applicable to a particular contract are those in effect at the time the parties entered into the contract. See Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1329 n.2 (Fed. Cir. 2001). In this case the Court cites the version of the DFARS which was in effect until March 17, 2022, see Defense Federal Acquisition Regulation Supplement: Technical Amendments, 87 Fed. Reg. 15816, 15819 (Mar. 18, 2022) (to be codified at 48 C.F.R. pt. 252), which is identical in all relevant respects to prior versions of the regulations for purposes of the present motions, compare DFARS 252.227-7013 (2015), with id. 252.227-7013 (2013), and id. 252.227-7013 (1995).

## BACKGROUND[2]

### I.     The Technical Data Regulations Incorporated into the Contracts

As noted, since 2009, the Army and Raytheon have been parties to a series of contracts under which Raytheon has provided engineering services in support of the Patriot weapons system.[3] Relevant to the issues before the Court, each of the contracts expressly incorporates the regulations at DFARS 252.227-7013 (2015) ("Rights in Technical Data") and DFARS 252.227-7037 (2016) ("Validation of Restrictive Markings on Technical Data"). App. to Def.'s Mot. at 11–13, 72–77, ECF No. 59-1.[4]

DFARS 252.227-7013(a)(15) (2015) defines "technical data" in pertinent part as "recorded information, regardless of the form or method of the recording, of a scientific or technical nature (including computer software documentation)." It further states that "[t]he term does not include computer software or data incidental to contract administration, such as financial and/or management information." Id.; see also 10 U.S.C. § 2302(4) (2012) (defining technical data in virtually identical terms).

The regulations at DFARS 252.227-7013(b) (2015) set forth three levels of license rights that the Department of Defense ("DoD") may assert in noncommercial technical data. In general, the allocation of data rights is based on the source of funding for its development. See DFARS

---

[2] The facts set forth in this section are based on the documents, answers to interrogatories, and deposition excerpts the parties have submitted in connection with their cross-motions for summary judgment. They are undisputed, except as noted in the text.

[3] The Army awarded Raytheon the first contract, Number W31P4Q-09-C-0057 (hereinafter "the 2009 contract"), on January 30, 2009. App. to Def.'s Mot. For Summ. J. ("App. to Def.'s Mot.") at 1, ECF No. 59-1. The follow-on contract, Number W31P4Q-14-C-0093 (hereinafter "the 2014 contract"), was awarded on August 15, 2014. Id. at 72, 74. Finally, on February 1, 2017, the Army awarded Raytheon a "continuation contract," arising under the same terms and conditions as the 2014 contract, Number W31P4Q-17-C-0073 (hereinafter "the 2017 contract"). Id. at 125–26.

[4] The government filed appendices consisting of some 880 pages in support of its Motion for Partial Summary Judgment. See ECF No. 59-1 (pages 1–511 of Defendant's Appendix); ECF No. 60-1 (pages 512–880 of Defendant's Appendix). It then filed appendices of more than 1,300 pages in support of its Response to Raytheon's Cross-Motion for Summary Judgment, see ECF No. 80-1 (pages 881–1422 of Defendant's Appendix); ECF No. 80-2 (pages 1423–2230 of Defendant's Appendix). It also filed three motions for leave to file additional exhibits, to which it appended an additional several hundred pages of documents. See ECF No. 86-1 (pages 2231–2293 of Defendant's Appendix); ECF No. 98-1 (pages 2294–2304 of Defendant's Appendix); ECF No. 116-1 (pages 2305–2473 of Defendant's Appendix); ECF No. 116-2 (pages 2474–2593 of Defendant's Appendix). These appendices are paginated consecutively, and the Court accordingly cites to the government's appendix as a single document ("Appendix to Defendant's Motion").

227.7103-4(a) (2022) ("For technical data that pertain to items, components, or processes, the scope of the license is generally determined by the source of funds used to develop the item, component, or process."); 10 U.S.C. § 2320 (2021). Where data pertain to an item or process developed exclusively with government funding, DoD receives unlimited rights to use or disclose the data to anyone and for any purpose. DFARS 252.227-7013(b)(1)(i) (2015); id. 252.227-7013(a)(16) (2015). If the data was developed exclusively with private funding, DoD receives limited rights and, with minor exceptions, may not share the information with anyone outside the government. Id. 252.227-7013(b)(3) (2015); id. 252.227-7013(a)(14) (2015). If the data pertain to an item or process developed with both government and private funding, DoD receives Government Purpose Rights for five years or another negotiable period. Id. 252.227-7013(b)(2)(i) (2015).

## II.    The Vendor Lists

As a result of a modification of the original 2009 contract, Raytheon became obligated to provide "Source/Vendor List[s]" to the Army on a quarterly basis beginning in 2012. App. to Def.'s Mot. at 17–19 (Contract Data Requirements List ("CDRL") Item E058).[5] Raytheon was to prepare the lists "[in accordance with]" Data Item Description ("DID") DI-MGMT-80894. Id. at 27 (Statement of Work for CDRL Item E058 § 2.2.1).[6]

DIDs are standardized forms (DD Form 1664, "Data Item Description") that describe the content, format, and intended use of data a contractor is obligated to supply to the DoD or one of its component agencies. See id. at 434 (DOD-STD-963A, Data Item Descriptions (DIDs) (Aug. 15, 1986) ("DOD-STD-963A"), ¶¶ 3.7, 3.12); see also DoD 5010.12-M, Acquisition Management System and Data Requirements Control List ("AMSDL"), May 1993, incorporating change 1 (Aug. 31, 2018) ("May 1993 AMSDL"), Ch. 3, § C3.3.1 (stating that the "[d]ata format and content [of CDRLs] are established by data acquisition documents that (with the exception of one-time DIDs) are approved and given OMB clearance by the AMSDL Clearance Office . . . and listed in the AMSDL").[7]

When drafting a CDRL, the contracting agency may reduce, but not add to or exceed, the scope of the information the DID requires the contractor to provide. App. to Def.'s Mot. at 484

---

[5] A CDRL is "[a] list of the data requirements that are authorized to be acquired for a specific acquisition, which is made a part of the contract." App. to Def.'s Mot. at 434 (DOD-STD-963A, Data Item Descriptions (DIDs) (Aug. 15, 1986), ¶ 3.7).

[6] DI-MGMT-80894, developed in 1989, see App. to Def.'s Mot. at 409, and its successor DID, DI-MGMT-80894A, developed in 1994, see id. at 410, are functionally identical for purposes of the parties' dispute, and the Court refers to them interchangeably in this Opinion.

[7] The DoD AMSDL Clearance Office is "[t]he office representing the Secretary of Defense that has been assigned the DoD-wide OMB clearance authority and responsibility for preparing and issuing the AMSDL, and for developing and implementing DoD policy for technical data requirements that are in compliance with [the Paperwork Reduction Act]." App. to Def.'s Mot. at 482 (May 1993 AMSDL, Definitions, § DL1.1.14).

(May 1993 AMSDL, Definitions, § DL1.1.27 ("Tailoring data requirements shall consist of
reducing the scope of an approved DID or source document, by specifying in Block 16 of the DD
Form 1423 those portions of the DID, or other data acquisition document, which are or are not
applicable to the specific acquisition.")); see also May 1993 AMSDL, Ch. 3, § C3.2.2 ("Block 16
of the DD Form 1423 may be used to explain how a particular DID applies to the specific
acquisition if the original format, content, intent, scope, and deliverables of the [DID] are not
exceeded or increased."); App. to Pl.'s Reply to Def.'s Opp. to Pl.'s Cross-Mot. for Summ. J. at
119 (Bond Dep. 58:21–59:4 (explaining that DoD "cannot add new data requirements that are
not in the already-approved DID by including anything in the CDRL," and "can only tailor a
DID down by removing requirements")), ECF No. 94-1. Contracting agencies are prohibited
from "exceed[ing] or increas[ing] the content, intent, scope, and deliverable . . . of an approved
data acquisition document." May 1993 AMSDL, Ch. 3, § C3.2.2.

Each DID is assigned to a "data functional area," which is "[a]n area which has a defined
scope based on the functional use of the data." App. to Def.'s Mot. at 434 (DOD-STD-963A,
¶ 3.11). The "MGMT" functional area "covers data required by the Government to manage,
provide visibility [of], and enforce contractual requirements in the form of record keeping or
deliverable products concerning project management milestones, technique, status (excluding
financial and technical), milestones, problems, plans, and other data not technically or financially
oriented." Id. at 470 (DoD 5010.12-L, Acquisition Management System and Data Requirements
Control List (Apr. 1, 1997), Part B.I.); but see id. at 195 (Def.'s Resps. to Pl.'s First Interrogs. at
27 (observing that "inclusion in an identified standardization area does not define the type of
information that may be included in DIDs" and that "it is more for indexing and to help with
searching for DIDs and other documents on similar subjects")).

As relevant to this case, Block 3 ("Description/Purpose") is set aside to identify the
purpose for which data is being acquired. Id. at 447 (DOD-STD-963A, ¶ 5.3.2.3). Block 3 of
DI-MGMT-80894 states that the purpose of requiring Raytheon to supply the vendor lists is "[t]o
identify a complete listing of all sources used . . . in procuring any subcontracted item," and to
provide "a means for the government to track parts selection, qualification, and identification of
parts." Id. at 409 (DI-MGMT-80894).

Block 10 ("Preparation Instructions") "contains the only portion of [a] DID that
represents the contractual requirement to be imposed on the contractor." Id. at 450
(DOD-STD-963A, ¶ 5.3.2.12). In this case, Block 10 of DI-MGMT-80894 instructs that each
vendor list must include the part number of the component purchased, the name and address of
the original manufacturer of the part, the supplier's Commercial and Government Entity
("CAGE") code, whether the part was specification controlled (and if so, its specification control
number), and whether the part was source controlled (and if so, the approved vendor part
number). Id. at 409 (DI-MGMT-80894); see App. to Pl.'s Cross-Mot. at 6–10 (vendor list
featuring CAGE codes, supplier names, and city and state), ECF No. 71-1.

The text inserted into Block 10 of DI-MGMT-80894 also specified the sources from
which Raytheon was to derive the information on the lists. It stated that Raytheon was to obtain

the required information "from contractor invoices, purchase orders, etc., and not from existing Government[-]furnished documentation." App. to Def.'s Mot. at 409 (DI-MGMT-80894).[8]

## III.    The Agency's Review of the Vendor Lists

Raytheon began supplying vendor lists to the agency on a quarterly basis beginning on June 14, 2012. Id. at 181 (Def.'s Resps. to Pl.'s First Interrogs. at 7). It provided six such lists through July 17, 2014. Id.; App. to Pl.'s Cross-Mot. at 6–17 (vendor lists); see also App. to Def.'s Mot. at 15–20, 42, 49 (exercising option to require the delivery of vendor lists under the 2009 contract). None of the lists Raytheon submitted contained the markings that are described in the technical data regulations.

The first two vendor lists Raytheon supplied bore restrictive markings that read, in pertinent part, as follows: "Distribution Statement E. Distribution authorized to DoD Components only due to Proprietary Information." App. to Pl.'s Cross-Mot. at 6 (vendor list E058-001, with restrictive data markings); App. to Def.'s Mot. at 181 (Def.'s Resps. to Pl.'s First Interrogs. at 7 (noting that vendor list E058-001 was received on June 14, 2012)). The lists were also marked with warnings that the documents "contain[] technical data whose export is restricted by the Arms Export Control Act (Title 22, U.S.C., Sec. 2751 et seq) or the Export Administration Act of 1979, as amended, Title 50, U.S.C., app. 2401 et seq." App. to Pl.'s Cross-Mot. at 6 (vendor list E058-001 dated June 12, 2012); see also id. at 8 (vendor list E058-002 dated July 16, 2013, with virtually identical restrictive data markings).

The 2012 modification of the original contract that required Raytheon to supply vendor lists to the government did not include language requiring that the Army explicitly approve their contents. See App. to Def.'s Mot. at 1283 (Statement of Work from CDRL Item E058, modifying the 2009 contract); see also id. at 1276 (Haynes Decl., July 6, 2021 (explaining that vendor lists submitted under the 2009 contract did not require approval)). An approval requirement was included, however, in both the 2014 follow-on contract and the 2017 continuation contract. Id. at 81 (Statement of Work from CDRL Item A024, modifying the 2014 contract); id. at 139 (Statement of Work from CDRL A028, modifying the 2017 contract); id. at 1276 (Haynes Decl., July 6, 2021 (explaining that vendor lists submitted under the 2014 and 2017 contracts were subject to government approval)).

Raytheon began submitting vendor lists for review under the 2014 contract on January 7, 2015. Id. at 182. It placed the same proprietary markings and export control warnings on these

_____

[8] According to the government, DI-MGMT-80894 was developed by the National Security Agency ("NSA") in 1989. App. to Def.'s Mot. at 1458 (Bond Decl. ¶ 3). The government's witness, Karen Bond, initially stated that the form was not listed in the April 2001 AMSDL (the last known version of the AMSDL), and so, she concluded, it had never been approved by DoD. Id. at 1459 (Bond Decl. ¶¶ 4–5). But the government has subsequently acknowledged that DI-MGMT-80894 appeared in another section of the AMSDL reserved for "Canceled/Super[s]eded DIDS," Def.'s Reply to Pl.'s Corrected Resp. to Def.'s Second Mot. for Leave to File Add'l Exs. at 17, ECF No. 107, which showed that it had been superseded by DI-MGMT-80894A, see App. to Def.'s Mot. at 1460–83, 1749.

lists that it had placed on the June 2012 and July 2013 vendor lists it submitted under the 2009 contract. App. to Pl.'s Cross-Mot. at 18–19 (vendor list A024 submitted January 7, 2015).

On January 16, 2015, the Army disapproved the January 7, 2015 lists. App. to Def.'s Mot. at 146 (January 16, 2015 letter from the Lower Tier Project Office ("LTPO") stating that "the content [of the vendor list] is deficient"). It asserted, without further explanation, that Raytheon should not have labelled the vendor lists as proprietary. Id. In addition, the Army advised Raytheon that it had used the wrong manufacturers' part numbers on the lists, and it requested clarification with respect to some of the other numerical identifiers on the lists. Id.

Raytheon resubmitted a corrected list on February 20, 2015. App. to Pl.'s Cross-Mot. at 20–21 (vendor list A024a dated February 20, 2015). Raytheon did not remove the proprietary markings and export control warnings whose legitimacy the Army had questioned, see id. at 21, but the agency nonetheless approved the list as corrected on March 16, 2015, App. to Def.'s Mot. at 148 (March 16, 2015 letter from LTPO approving vendor list A024a).[9]

Raytheon submitted another vendor list on June 9, 2015, which contained the same legend as the February vendor list. App. to Pl.'s Cross-Mot. at 24–26 (vendor list A024-001 submitted by letter of June 9, 2015). Notwithstanding its approval of the February vendor list, the Army disapproved the June vendor list on July 13, 2015. App. to Def.'s Mot. at 149 (Army disapproval of vendor list A024-001). It explained that it objected "to the restriction of [its] rights and usage of this data and the inappropriate markings [on the vendor list]." Id. Specifically, the letter stated, the vendor list "d[id] not reflect appropriate DFARS restrictive markings/legends." Id. Raytheon was instructed to mark future lists according to the technical data provisions of the DFARS. Id.

Raytheon responded by letter of August 20, 2015. Id. at 150–51. In its letter, Raytheon asserted that its vendor lists did not include technical data as defined by DFARS 252.227-7013(a)(15) (2015) and thus were not subject to the provisions of the technical data regulations. Id. at 150. Instead, Raytheon explained, its vendor lists contained "management" information, which Raytheon contended "is and remains Raytheon proprietary data." Id. It stated that it intended to modify the legends it placed on the vendor lists to reflect that view, id. at 151, and in fact did so when it resubmitted the vendor list for the agency's approval on August 24, 2015, App. to Pl.'s Cross-Mot. at 27–28 (resubmittal A024-001a dated August 24, 2015).

As modified, the resubmitted list contained the following legend:

RAYTHEON COMPANY PROPRIETARY DATA
Information contained herein is proprietary to Raytheon Company, is submitted in confidence, and is privileged and exempt from disclosure by the U.S. Government under paragraph (b) of the Freedom of Information Act (5 USC 552) and subject to 18 USC 1905.

---

[9] The Contracting Officer later asserted that the corrected list had been approved "in error." See App. to Def.'s Mot. at 168 (COFD).

Id. at 28.

On September 20, 2016, the Army challenged Raytheon's use of this new legend. App. to Def.'s Mot. at 152–53 (September 20, 2016 letter from Contracting Officer ("CO") Glynis Draper). The CO explained that—in the Army's view—the information contained in the vendor list "fits the definition of 'technical data' set out in DFARS 252.227-7013(a)(15) because it is 'recorded information . . . of a scientific or technical nature.'" Id. at 152. "Specifically," the CO observed, "the technical data in question includes a list of technical parts, part numbers, and sources." Id. Further, she stated, Raytheon's vendor list not only constituted "necessary technical information in and of itself," but also contained "essential information [when used] in conjunction with other technical data such as technical drawings." Id.

The CO rejected Raytheon's contention that—because the vendor lists are submitted pursuant to a "management" data item description (i.e., the "MGMT" in DI-MGMT-80894)—they cannot be considered technical in nature. Id. at 152–53; see also id. at 150. She instructed Raytheon to remove the proprietary data legend within sixty days and resubmit the vendor list. Id. at 153.

By letter of November 9, 2016, Raytheon declined to comply with the CO's directive. Id. at 154–57. It reiterated its view that the information contained in the vendor lists "consists entirely of management, not technical, information," citing again the definition of technical data set forth in DFARS 252.227-7013(a)(15) (2015). Id. at 154–55. Raytheon also challenged the CO's conclusion that it was irrelevant that the DID that covered the vendor lists had been designated within the "management" classification. Id.; see also id. at 152–53 (September 20, 2016 letter from CO Glynis Draper).

On March 2, 2017, the Army again rejected Raytheon's characterization of the vendor lists, repeating its view that the information in the list "falls squarely within the definition of technical data found in DFARS 252.227-7013(a)(15) and, as such, is subject to the marking requirements of DFARS 252.227-7013 for technical data." Id. at 158 (March 2, 2017 letter from CO Glynis Draper). The CO noted that, consistent with this position, the Army had previously directed Raytheon to remove its nonconforming markings within sixty days. Id. at 159. Because Raytheon had failed to do so, the CO explained, the Army "plan[ned] to remove the non-conforming markings from the delivered [vendor lists] at Raytheon's expense." Id. The letter instructed that, in future submittals, Raytheon should "specifically . . . identify the portion to be segregated out (from the technical data) as 'management data.'" Id.

Raytheon submitted vendor lists under the 2017 continuation contract on May 2, 2017, and again on August 29, 2017. App. to Pl.'s Cross-Mot. at 35–36. The Army disapproved both submissions on October 27, 2017. App. to Def.'s Mot. at 160–61. It reiterated that the legends Raytheon had affixed to the vendor lists were "non-conforming technical data markings" and should be removed before the vendor lists were resubmitted. Id.

Raytheon submitted the final three vendor lists due under the 2017 contract on November 21, 2017, December 5, 2017, and February 28, 2018. See id. at 162–66. By letters dated March

29, 2018, the CO reiterated the Army's position that Raytheon had again placed "non-conforming technical data markings" on the vendor lists, but approved them in any event pending issuance of a COFD. Id. at 163–66.

## IV.    The Contracting Officer's Final Decision

On June 21, 2018, the CO issued a COFD in response to Raytheon's November 9, 2016 letter asserting a right to affix proprietary legends to its vendor lists. Id. at 167–73 (COFD); see also id. at 154–57. The CO reiterated that the Army "strongly considers the [vendor lists] to be 'technical data' within the meaning of applicable regulations" because they contain "a list of technical parts, part numbers, and sources." Id. at 170. She further added that the vendor lists not only "independently provide necessary technical information," but that they "are also used in conjunction with other technical data (such as technical drawings) to maintain essential Army systems and databases" and are necessary "to perform essential technical functions related to the repair and replacement of parts." Id. The CO also observed that Raytheon had been providing information "essentially identical" to that contained in the vendor lists as part of its "TDP deliverables"—i.e., its drawings—and yet it had not included restrictive markings on those items. Id. at 171.[10]

The CO instructed Raytheon to remove the nonconforming markings from the lists and also directed Raytheon that within ninety days it must replace its proprietary legend with one that recognized "government purpose rights" in the vendor lists, with an expiration date of no more than five years. Id. at 172 (citing DFARS 252.227-7013(f)(2) (2015) ("Government purpose rights markings")); see also DFARS 252.227-7013(b)(2) (2015) ("Government purpose rights"); id. 252.227-7013(h)(2) (2015) ("Nonconforming technical data markings"). The CO also warned that she would disapprove all future submissions with nonconforming markings and reserved the right to withhold 10% of the total contract price until Raytheon came into compliance with these directives. App. to Def.'s Mot. at 172.

## V.    The Present Action

Raytheon filed the present Complaint on June 17, 2019, challenging the COFD on both substantive and procedural grounds. In Counts I and II, Raytheon alleges that, when the CO directed Raytheon to affix Government Purpose Rights legends to its lists, it was denied certain procedural rights afforded by 10 U.S.C. § 2321(d) (2021) and DFARS 252.227-7037 (2016). See Compl. ¶¶ 49–55 (Count I); id. ¶¶ 56–65 (Count II). Raytheon seeks a declaration that—as a consequence of the alleged procedural violations—the COFD is "void." See id. ¶¶ 49–65; see also id. at 23 (requesting "a declaratory judgment finding that the Army violated 10 U.S.C. § 2321 and, as a result, the COFD is void").

In Count III, Raytheon seeks a declaration that its vendor lists are not technical data as defined by DFARS 252.227-7013(a)(15) (2015) as a matter of law, and thus are not subject to

---

[10] The CO was referring to the fact that some of the technical drawings in Raytheon's "Technical Data Package," see App. to Def.'s Mot. at 155, also included the names of suppliers of parts depicted in the drawings, see id. at 1402, 1418–23 (contract engineering drawings).

the technical data rights provisions and marking requirements set out in DFARS 252.227-7013(b) (2015). Id. ¶¶ 66–73. Count IV asks the Court to declare the COFD "void" insofar as it states that Raytheon's vendor lists are technical data, and also declare that the Army breached the contracts by treating the vendor lists as such. Id. ¶¶ 74–80. Count V seeks a declaration that, even if the vendor lists are technical data, the government is entitled only to "limited rights" in the lists because they were allegedly developed at private expense pursuant to DFARS 252.227-7013(a)(8)(i) (2015). Id. ¶¶ 81–87.

On September 16, 2019, the government filed a motion to dismiss Count I of the Complaint for lack of subject matter jurisdiction, in accordance with Rule 12(b)(1) of the Rules of the Court of Federal Claims ("RCFC"), or alternatively for failure to state a claim under RCFC 12(b)(6). See Def.'s Mot. to Dismiss Parts of the Compl., ECF No. 8. The Court denied the government's motion on January 14, 2020. See Op. and Order, ECF No. 25.

On December 31, 2020, the government moved for summary judgment as to Counts I–IV of the Complaint. See Def.'s Mot. Raytheon filed a consolidated Cross-Motion for Summary Judgment and Response on March 29, 2021. Pl.'s Cross-Mot. The government filed its consolidated Response to Raytheon's cross-motion and Reply on July 9, 2021, Def.'s Opp'n to Pl.'s Cross-Mot. for Summ. J. and Def.'s Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("Def.'s Resp."), ECF No. 80, and Raytheon filed its Reply on September 14, 2021, Pl.'s Reply to Def.'s Opp. to Pl.'s Cross-Mot. for Summ. J. ("Pl.'s Reply"), ECF No. 94.[11]

Oral argument was held on the parties' cross-motions for summary judgment on April 21, 2022.

## DISCUSSION

### I.   Standards for a Motion for Summary Judgment

Pursuant to RCFC 56(a), summary judgment is appropriate where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." Id. at 248. An issue is genuine if it "may reasonably be resolved in favor of either party." Id. at 250.

"The moving party bears the burden of establishing the absence of any genuine issue of material fact and all significant doubt over factual issues must be resolved in favor of the party

---

[11] On November 12, 2021, the government filed a motion for summary judgment as to Count V of Raytheon's Complaint, in which it argued that (assuming that the vendor lists are technical data) it is entitled to unlimited rights in the vendor lists because Raytheon cannot demonstrate that the vendor lists were created or developed exclusively at private expense and/or not delivered with restrictive markings. See generally Def.'s Alternative Mot. for Summ. J.; see also 10 U.S.C. § 2320(a)(2)(A) (2021). The Court stayed briefing on the government's motion pending the resolution of the parties' cross-motions for summary judgment as to Counts I–IV. See Order, ECF No. 110.

opposing summary judgment." <u>Mingus Constructors, Inc. v. United States</u>, 812 F.2d 1387, 1390 (Fed. Cir. 1987). The court should act with caution in granting summary judgment and may deny summary judgment "where there is reason to believe that the better course would be to proceed to a full trial." <u>Anderson</u>, 477 U.S. at 255.

## II.    Merits

The threshold issue in this case is whether the information on the vendor lists is technical data within the meaning of DFARS 252.227-7013(a)(15) (2015). For the reasons set forth below, the Court has determined that it is <u>not</u>. Therefore, Raytheon is entitled to summary judgment as to Counts III and IV of its Complaint, and the remainder of its claims—which are predicated on the supposition that the information on the lists <u>is</u> technical data—will be dismissed as moot.[12]

### A.    <u>The Regulatory Language Defining Technical Data</u>

The interpretation of a regulation that is incorporated into a contract begins with its plain language. <u>Boeing Co. v. Sec'y of the Air Force</u>, 983 F.3d 1321, 1326 (Fed. Cir. 2020) (citing <u>Am. Airlines, Inc. v. United States</u>, 551 F.3d 1294, 1299 (Fed. Cir. 2008); <u>Lockheed Corp. v. Widnall</u>, 113 F.3d 1225, 1227 (Fed. Cir. 1997)). The regulatory provision whose interpretation is at issue here states in pertinent part that the term "[t]echnical data means recorded information . . . of a scientific or technical nature." DFARS 252.227-7013(a)(15) (2015). The regulation does not define the phrase "information . . . of a . . . technical nature," except to state what it does not include, which is "computer software or data incidental to contract administration, such as financial and/or management information." <u>Id.</u>; <u>see also</u> 10 U.S.C. § 2302(4) (2020) (excluding from the definition of technical data "financial, administrative, cost or pricing, or management data or other information incidental to contract administration").

The information Raytheon has supplied in its vendor lists has varied in minor respects over time. <u>Compare</u> App. to Pl.'s Cross-Mot. at 9 (vendor list submitted July 16, 2013, featuring CAGE code, and supplier name, city, and state), <u>with id.</u> at 13 (vendor list submitted January 14, 2014, featuring part/source control number, CAGE code, and supplier name, city, and state), <u>and id.</u> at 19 (vendor list submitted January 7, 2015, featuring material number, part description, manufacturing part number, and supplier name, identification numbers, street address, city, state, and zip code), <u>and id.</u> at 25 (vendor list submitted June 10, 2015, also featuring last purchase date). The variations are not material. In general, the lists' contents have included generic descriptors of parts Raytheon has purchased, coupled with numerical identifiers, along with the

---

[12] Also before the Court are three motions for leave to file additional exhibits, filed by the government, <u>see</u> ECF Nos. 86, 98, and 116, and a motion for leave to file notice of additional authority, ECF No. 115. Raytheon initially opposed the motions but at the oral argument it withdrew its opposition. Tr. of Oral Arg. at 76:14–20 (noting its "object[ion] to their inclusion," but requesting that, if the Court does consider the additional exhibits, it "consider [Raytheon's] positions as well"). The Court will therefore grant the government's motions and accept the exhibits into the record for purposes of ruling on the cross-motions for summary judgment.

identity, address, and DUNS number of the supplier or manufacturer that sold the parts to Raytheon. See generally App. to Pl.'s Cross-Mot. at 19–25.[13]

"When terms [in a regulation] are undefined, the court may consider the [dictionary] definitions of those terms in order to determine their meaning." Mass. Mut. Life Ins. v. United States, 782 F.3d 1354, 1367 (Fed. Cir. 2015). The Oxford English Dictionary defines the adjective "technical" to mean "of or pertaining to the mechanical arts and applied sciences generally," 17 Oxford English Dictionary 703 (2d ed. 1989), and the noun "nature" as "[t]he essential qualities or properties of a thing" which are "inherent" and "giv[e] it its fundamental character," 10 Oxford English Dictionary 247 (2d ed. 1989). In the Court's view, the information on the vendor lists is not inherently or essentially technical in nature. To the contrary, the vendor lists are just what their name implies—lists of the vendors from which Raytheon purchased parts used in the missile system.

Further, the lists do not include information about the technical aspects of the parts Raytheon purchased. They do not, for example, reveal the physical, functional, or performance requirements of the components listed. Cf. DFARS 252.227-7013(a)(11) (2015) (defining "[f]orm, fit, and function data" as "technical data that describes the required overall physical, functional, and performance characteristics (along with the qualification requirements, if applicable) of an item, component, or process to the extent necessary to permit identification of physically and functionally interchangeable items"). The lists also do not include any information about the design, manufacture, or assembly of any of the parts. Cf. DFARS 252.227-7013(a)(6) (2015) (defining "[d]etailed manufacturing or process data" as "technical data that describe the steps, sequences, and conditions of manufacturing, processing or assembly used by the manufacturer to produce an item or component or to perform a process").

In fact, and contrary to the government's assertion, the lists do not even "describe" the purchased parts in any meaningful way. See Def.'s Mot. at 26 (arguing that, "[l]ike Form, fit and function data," which describe a component's characteristics, the vendor lists Raytheon supplies "are technical data pertaining to items and components of th[e Patriot] weapon system"). Instead, the lists label the parts generically (e.g., "cable assembly," "sleeving," "connector") and couple the generic names with "material numbers" (i.e., the identifiers assigned to the engineering drawings for each of the parts). See App. to Pl.'s Cross-Mot. at 19 (vendor list with part descriptions); id. at 66 (Haynes Dep. 54:11–17, 56:12–22 (explaining that each part with a material number has a corresponding engineering drawing)); Def.'s Mot. at 26 (noting that the "supplier information [on the vendor lists] is tied to a specific numbered part/contract drawing"). The generic labels alone cannot be used to distinguish between or identify parts. See, e.g., App. to Pl.'s Cross-Mot. at 19, 21 (vendor lists with part descriptions). The parts on the lists are individually identifiable only if one cross-references their associated material number with the contract engineering drawing for that part. See App. to Def.'s Mot. at 976 (Haynes Dep. 49:8–12 (testifying that he refers to contract drawings in conjunction with vendor lists when he has

_____

[13] The federal government utilizes Dun & Bradstreet's Data Universal Numbering System ("DUNS"), under which businesses are assigned a nine-digit identification code "to uniquely identify the entities with which it does business." L. Elaine Halchin, Cong. Rsch. Serv., R44490, Unique Identification Codes for Federal Contractors: DUNS Numbers and CAGE Codes (2017).

questions about a given part)); id. at 978 (Haynes Dep. 54:11–17 (testifying that "contract [engineering] drawings" feature "the same number as the material number that's listed on the [vendor list]")); id. at 213 (Davidson Decl. ¶ 4 (noting that contract engineering "drawings often help provide the link to specific parts and qualified sources found listed in the [vendor list]")); see also Def.'s Mot. at 28 (stating that "Army engineers[] use the supplier and subcontractor information on the Vendor Lists, together with the same kind of information obtained from Patriot contract engineering drawings"); Def.'s Resp. at 3 (stating that "physical or performance characteristics of [a] part need not appear on the Vendor Lists . . . [because] Army engineers can obtain detailed physical or performance characteristics of the part from the corresponding Patriot engineering drawings").

    The government contends that the vendor lists are nonetheless technical in nature because they "demonstrate . . . that the particular part was qualified to be in the Patriot weapon system." Def.'s Resp. at 1; see also id. at 2 (asserting that the vendor lists convey technical data because they "manifest that the parts listed are qualified to be in the Patriot weapon system"). It is unclear exactly what this means. See App. to Def.'s Mot. at 1783 (Loomis Dep. 68:1–6 (stating that the vendor list is a "buy history" and that he did not know whether the list "indicates anything more than that" or "what the term 'qualified' would mean in the vendor list context")). The lists alone do not reveal anything of substance about the parts other than that Raytheon purchased them within the preceding two years and from whom they were purchased. Id. at 1787 (Loomis Dep. 83:3–5 (explaining that the vendor lists included "a group of suppliers relevant to that purchase history over those past two years")); id. at 1789 (Loomis Dep. 91:14–92:6 (acknowledging that "the CDRL and the DID . . . don't specify a time period" but stating that he knew the vendor lists had a look-back period of "approximately two years")); id. at 1996 (Patriot Source/Vendor List PowerPoint presentation slides (specifying a two-year "look back")).

    Further, there are parts in the Patriot weapons system that are not on the lists at all because there is no recent purchase history for them. Id. at 1779 (Loomis Dep. 51:7–23 (stating that the vendor lists are "a listing of those parts that [Raytheon] bought during [a] certain time period [as specified by the contract] . . . not every single part . . . only those parts that [it] purchased during that time period")).

    The Army has characterized the vendor lists as "qualified supplier lists" and stated that its engineers use the lists to identify such qualified suppliers. See id. at 199 (Def.'s Resps. to Pl.'s First Interrogs. at 31 ("Army engineers . . . have been orally instructed that, if an item/part is listed by Raytheon in its Vendor Lists, [they] may purchase such item/part only from the qualified and approved sources identified in Raytheon's Vendor Lists and/or the Patriot Missile System contract [engineering] drawings.")); id. at 209 (Lococo Decl. ¶¶ 1–2 (noting that Army engineers use the vendor lists to procure parts from "verified or qualified vendors sanctioned by LTPO by way of Raytheon")); id. at 212–13 (Davidson Decl. ¶¶ 3–5 (noting that she uses the vendor lists to find "qualified sources" of parts)); id. at 929, 931 (Davidson Dep. 13:4–8, 19:17–21 (explaining that she looked at the vendor lists "to see who the qualified source was")). Nonetheless, it bears noting that Raytheon was not tasked with providing a list of qualified suppliers every quarter; it was required to submit a quarterly purchase history. Each quarterly history had a two-year look-back period. Id. at 1787, 1789 (Loomis RCFC 30(b)(6) Dep. 83:1–5, 91:14–92:6). Conceivably there might be suppliers on the vendor lists that had gone out of

business, or that were no longer qualified for another reason to produce the parts they once supplied. Raytheon's vendor lists include no certification regarding the qualifications of the listed suppliers.

The government also points out that some of the engineering drawings contain references to the suppliers of the parts described therein, many of which are suppliers Raytheon had previously qualified to provide parts depicted on the drawings. Def.'s Mot. at 26 (arguing that "contract engineering drawings contain the same kind of information for approved suppliers and subcontractors for parts and components of the system that is in the Vendor Lists"); id. at 27, 29–30; Def.'s Resp. at 9 (asserting that "engineering drawings may contain supplier information for parts . . . [and] supplier information" which "identif[ies] Raytheon qualified or approved sources for qualified Patriot parts [and] is 'technical data'"). To be sure, it is well established that engineering drawings themselves constitute technical data. See, e.g., Williams Int'l Corp. v. United States, 7 Cl. Ct. 726, 727 (1985) (discussing "technical data consisting of drawings depicting components of the cruise missile engine"); Grumman Aerospace Corp. v. Wynne, 497 F.3d 1350, 1353 (Fed. Cir. 2007) (describing engineering drawings as technical data). But the part names and material numbers on the vendor lists are disaggregated from the drawings. And Raytheon is not seeking to restrict the government's use of the drawings; it is asserting rights only as to the vendor lists.

The Court also finds it telling that the information on the lists was not derived from technical sources or prepared by technical experts. Instead, as instructed by DI-MGMT-80894, Raytheon was to assemble the lists from information contained in contractor invoices and purchase orders. App. to Def.'s Mot. at 409 (DI-MGMT-80894); see also id. at 1777 (Loomis RCFC 30(b)(6) Dep. 43:2–4 (explaining that, in preparing vendor lists, Raytheon "would rely on [its] PRISM system and . . . purchase history," and that it would "pull[] a report out of [its] purchase history")); id. at 1774 (Loomis RCFC 30(b)(6) Dep. 31:16–21 (noting that the vendor list is "just a purchase order list")).[14] In other words, the information on the vendor lists was derived from precisely the type of "financial, administrative, cost or pricing, or management data or other information incidental to contract administration" that is expressly excluded from the statutory definition of technical data. See 10 U.S.C. § 2302(4) (2020).

Finally, the Court is not persuaded by the government's arguments that the information on the vendor lists is technical in nature because it is "used by persons with technical expertise to accomplish technical tasks of ensuring that all parts of the Patriot System are properly maintained, replaced and/or repaired such that this weapon system functions as required." Def.'s Mot. at 28 (also observing that "Army employees, including Army engineers, use the supplier and subcontractor information on the Vendor Lists . . . to provide technical advice on qualified and approved sources for the Army's purchase of items/parts for the continued operation, maintenance and repair of the system"). The regulations define technical data as information that is of a technical "nature," and not, more broadly, as information that is useful to those who perform technical tasks. See DFARS 252.227-7013(a)(15) (2015). For the reasons set forth

---

[14] Mr. Loomis explained at his deposition that "PRISM is [Raytheon's] material requirements planning tool," and that it is "basically a . . . large software package." App. to Def.'s Mot. at 1773–74 (Loomis RCFC 30(b)(6) Dep. 29:22–30:1).

above, the information on the lists is not, by its nature, inherently technical, and therefore is not technical data within the plain meaning of the regulation.

## B.   DI-MGMT-80894

In their briefs, the parties debate at some length the relevance of DI-MGMT-80894 to whether the information on the vendor lists is technical data. See Def.'s Mot. at 32–35; Pl.'s Cross-Mot. at 3–4, 23–26; Def.'s Resp. at 16–19, 21; Pl.'s Reply at 6–8, 12–18; see also Def.'s Mot. for Leave to File Add'l Exs. at 2, ECF No. 86; Def.'s Second Mot. for Leave to File Add'l Exs. at 2–4, ECF No. 98. Raytheon emphasizes that, in Block 3 of DI-MGMT-80894, the Army represented that it intended to use the lists for management purposes, i.e., to identify a list of vendors used to procure parts as "a means for the government to track parts selection, qualification, and identification of parts." Pl.'s Cross-Mot. at 3, 5, 17, 24 (citing App. to Def.'s Mot. at 409 (DI-MGMT-80894)). It contends that these purposes—along with the "MGMT" functional area to which the DID was assigned, id. at 3–5, 24–26—reflect that DoD has historically treated the information on the vendor lists as "data incidental to contract administration, such as financial and/or management information," and therefore expressly excluded from the definition of technical data, id. at 17, 24; DFARS 252.227-7013 (2015).

The government, for its part, argues that Block 3 was not incorporated into Raytheon's contracts and so does not preclude the Army from using the vendor lists for purposes other than those set forth on the form. See Def.'s Mot. at 33 (arguing that "the DID form does not control the uses to which [DoD] puts technical data delivered to [it] pursuant to contract," and that, "[i]n the context of the Patriot Missile System, the Vendor Lists are more than 'a means for tracking parts selection, qualification, and identification of parts'"); Def.'s Mot. for Leave to File Add'l Exs. at 2–3 (asserting that this language "was not incorporated in the parties' contract and did not restrict the Government's uses of the Vendor Lists").

The government also questions the provenance of the decision to assign DI-MGMT-80894 to the "management" functional area, arguing that it did not reflect a determination regarding whether the information on the lists constitutes "technical data." See, e.g., Def.'s Mot. at 32–35 (observing that "[t]he genesis of the DI-MGMT-80894A form . . . does not support Raytheon's claim that the form demonstrates that Vendor Lists are 'management information' for purposes of [the technical data regulations]" because "the NSA unilaterally prepared DI-MGMT-80894 and DI-MGMT-80894A, and the [DoD AMDSL Clearance Office] did not clear these DIDs"); see also Def.'s Resp. at 17–19 (same); id. at 21–22 (noting that "[t]echnical data also can be delivered under CDRLs referencing DIDs assigned to the MGMT area" and asserting that "[h]ow information delivered pursuant to a CDRL is used is not determined by the agency that prepared and approved the DID, or the area in which the preparing agency assigned the DID"); Def.'s Second Mot. for Leave to File Add'l Exs. at 2, 6, 7 (asserting that DI-MGMT-80894 and its successor DID were "developed and adopted by [NSA] in 1989," and "there is no person at the NSA . . . who knows for certain what happened when [it] developed this DID in 1989, and later revised it in 1994," but that, "since 1989, the NSA has had an exemption from 'participating in any . . . DID Development approval process [overseen by the DoD AMDSL Clearance Office]'"); Def.'s Third Mot. for Leave to File Add'l Exs. at 3–5

(arguing that the NSA developed DI-MGMT-80894 and its successor DID at a time when its DIDs were not subject to approval by the DoD AMDSL Clearance Office), ECF No. 116.

The Court concludes that the Army's use of DI-MGMT-80894 to define the required contents of the vendor lists has only limited, if any, bearing on the legal issues before the Court. The "MGMT" functional area was not assigned to the DID for purposes of making a decision whether the information on the lists was "technical data." The government's witness, at least, seemed to be of the view that—irrespective of what DoD's issuances provide—the decision to assign a DID to a particular area is not a substantive one. App. to Def.'s Mot. at 1458 (Bond Decl. ¶ 3 (testifying that the assignment to a particular "area does not define the type of information that may be included in DIDs – it is more for indexing and to help with searching the DIDs and other documents on similar subjects")); App. to Pl.'s Cross-Mot. at 113 (Bond Dep. 34:10–21 (testifying that "[t]he definition of the functional area . . . doesn't really have any bearing on the data deliverable," and that "the guts of the DID" are in its format and contents section (i.e., Block 10))). The Court's determination that the information on the lists is not technical data, therefore, does not rely on the functional area assigned to DI-MGMT-80894.

The Court is also not persuaded by Raytheon's arguments that Block 3 ("Description/Purpose") of DI-MGMT-80894 was incorporated into the contract, and that the Army was therefore contractually obligated to use the lists only for the management purposes identified therein. See Pl.'s Cross-Mot. at 5 ("The Vendor Lists only comprise information, such as business names and addresses, about the supplier or suppliers from whom Raytheon procured the parts as a means for the Government 'to track' part selection, qualification and identification," and they are "delivered for the Government's administration or management of the Contracts." (citing DI-MGMT-80894A, Block 3)); id. at 17 ("In other words, the express purpose of the Vendor Lists is to provide the Government with a means of administering the contract by monitoring the contractor's sources of supply, rather than to provide the Government with scientific or technical information about those supplies."); id. at 24; Pl.'s Reply at 6–7 (arguing "that DI-MGMT-80894A is expressly incorporated into the Contracts, and pursuant to DoD policy, it defines and circumscribes the permitted use of the Vendor Lists" because "the intended use, format and content of CDRLs is established and circumscribed by the authorizing DID" (citing May 1993 AMSDL)).

As the court of appeals recently observed, "[i]ncorporation by reference 'provides a method for integrating material from various documents into a host document . . . by citing such material in a manner that makes clear that the material is effectively part of the host document as if it were explicitly contained therein.'" CSI Aviation, Inc. v. Dep't of Homeland Sec., 31 F.4th 1349, 1355 (Fed. Cir. 2022) (alteration in original) (quoting Zenon Env't, Inc. v. U.S. Filter Corp., 506 F.3d 1370, 1378 (Fed. Cir. 2007)). "To incorporate material by reference," however, "'the incorporating contract must use language that is express and clear, so as to leave no ambiguity about the identity of the document being referenced, nor any reasonable doubt about the fact that the referenced document is being incorporated into the contract.'" Id. (quoting Northrop Grumman Info. Tech., Inc. v. United States, 535 F.3d 1339, 1344 (Fed. Cir. 2008)). "Said differently," the court of appeals instructs, "'the language used in a contract to incorporate extrinsic material by reference must explicitly, or at least precisely, identify the written material being incorporated,'" and finally that it "'must clearly communicate that the purpose of the

reference is to incorporate the referenced material into the contract (rather than merely to acknowledge that the referenced material is relevant to the contract, e.g., as background law or negotiating history).'" Id. (quoting Northrop, 535 F.3d at 1345).

In this case, the contracts state that Raytheon shall prepare the vendor lists "IAW"—that is, in accordance with—DI-MGMT-80894. See App. to Def.'s Mot. at 27 (CDRL Item E058 § 2.2.1, incorporating Statement of Work requiring delivery of Vendor Lists); id. at 71 (CDRL Item A024 § 3.6.2.2, incorporating Statement of Work requiring delivery of Vendor Lists); id. at 137 (same). This language expressly imposes obligations on Raytheon to supply the information specified in Block 10 when preparing its vendor lists. But the contract contains no language expressly and clearly imposing an obligation on the Army to limit its use of the lists to the purposes set forth in Block 3. In fact, the Document Summaries, which are part of the contract, expressly state that Block 3 is for reference only. See App. to Def.'s Mot. at 2246, 2271, 2292 (Document Summary Lists providing that Block 10 of DI-MGMT-80894 "contains the only portion of the DID that represents a contractual requirement imposed on the contractor," and that "[a]ll other blocks are for Government use and for reference only"). The Court therefore does not consider Block 3 a significant indicator of whether the information on the lists is technical data.

### C.   DoD's Interpretation of Prior Regulatory Language

The Court finds support for its reading and application of DFARS 252.227-7013(a)(15) (2015) in DoD's interpretation of the regulatory definition of technical data in Armed Services Procurement Regulation, 32 C.F.R. § 7-104.9(a) (1977) ("Rights in Data and Computer Software"), which Congress ratified when it passed the Defense Procurement Reform Act of 1984, Pub. L. No. 98-525, 98 Stat. 2588. That regulation stated that technical data includes "recorded information, regardless of form or characteristic, of a scientific or technical nature" but "does not include computer software or financial, administrative, cost and pricing, and management data or other information incidental to contract administration." 32 C.F.R. § 7-104.9(a) (1977); see also App. to Def.'s Mot. at 323, 325, 340 (Defense Acquisition Circular 84-1, 49 Fed. Reg. 38,549, 38,576, 38,591 (Oct. 1, 1984)); id. at 351 (48 C.F.R. § 227.401 (1984) (containing the identical definition of technical data)).[15]

The prior regulation is also instructive because of the additional explanatory material it contained, stating that technical data "may be graphic or pictorial delineations in media such as drawings or photographs; text in specifications or related performance or design type documents; or computer printouts . . . includ[ing] research and engineering data, engineering drawings and associated lists, specifications, standards, process sheets, manuals, technical reports, catalog item

---

[15] The Defense Acquisition Regulations, formerly the Armed Services Procurement Regulations ("ASPR"), were replaced by the Federal Acquisition Regulations ("FAR") in 1984. FMC Corp. v. United States, 853 F.2d 882, 884 n.2 (Fed. Cir. 1988); see also Jeff E. Schwartz, The Acquisition of Technical Data Rights by the Government, 23 Pub. Cont. L.J. 513, 514 n.2 (1994) (observing "that the early version of the Defense Federal Acquisition Regulation Supplement, 48 C.F.R. § 227.4" adopted ASPR §§ 9-202 and 9-203, which defined technical data, virtually "unchanged").

identifications and related information and computer software documentation." 32 C.F.R. § 7-104.9(a) (1977).

These examples of technical data are qualitatively different from the information on the vendor lists. In addition to referencing drawings and photographs (which the vendor lists are not), they reference text that appears "in specifications or related performance or design type documents or computer printouts." 32 C.F.R. § 7-104.9(a) (1977). The vendor lists are not "performance or design type documents."

Similarly, the prior regulations identified "research and engineering data, engineering drawings and associated lists" as technical data. Id. "Engineering data" includes "[e]ngineering documents such as drawings, associated lists, accompanying documents, manufacturer specifications and standards, or other information prepared by a design activity and relating to the design, manufacture, procurement, test or inspection of items." App. to Def.'s Mot. at 1313 (MIL-STD-100G, DoD Standard Practice for Engineering Drawings (June 9, 1997), § 3.29). Vendor lists are not prepared by "design activit[ies]," i.e., "contractor[s] or Government activit[ies] having responsibility for the design of a given part, and for the preparation and currency of engineering drawings and other technical data for that part." DFARS Procedures, Guidance, and Information 1-103.12. They are instead prepared by Raytheon management personnel based on invoices and similar documents that can be used to prepare a purchase history.

An engineering drawing, likewise, is "[a]n engineering document or digital data file(s) that discloses (directly or by reference), by means of graphic or textual presentations, or combinations of both, the physical and functional requirements of an item." Id. (MIL-STD-100G, DoD Standard Practice for Engineering Drawings (June 9, 1997), § 3.25). The vendor lists, as explained above, do not disclose the physical or functional requirements of the parts listed. Nor is a vendor list comparable to an "associated list," i.e., "[a] tabulation of pertinent engineering information pertaining to an item depicted on an engineering drawing or on a set of engineering drawings." Id. at 1311 (MIL-STD-100G (June 9, 1997), DoD Standard Practice for Engineering Drawings, Definitions, § 3.8).

The earlier regulations also cited "specifications [and] standards" as types of technical data. 32 C.F.R. § 7-104.9(a) (1977). Vendor lists are qualitatively different from both. A specification is "[a] document prepared to support acquisition that describes essential technical requirements for materiel and the criteria for determining whether those requirements are met." App. to Def.'s Mot. at 1317 (MIL-STD-100G, DoD Standard Practice for Engineering Drawings (June 9, 1997), § 3.64 (citing MIL-STD-961)); MIL-STD-961C, Military Specifications and Associated Documents, Preparation of (May 20, 1988), § 3.33 ("A document prepared specifically to support acquisition which clearly and accurately describes essential technical requirements for purchasing materiel. Procedures necessary to determine that the requirements for the materiel covered by the specification have been met are also included."). A standard is "[a] document that establishes uniform engineering or technical criteria, methods, processes, and practices." App. to Def.'s Mot. at 1317 (MIL-STD-100G, DoD Standard Practice for Engineering Drawings (June 9, 1997), § 3.65 (citing MIL-STD-962, § 3.24 (stating the same))); see also MIL-D-5480F, Military Specification Data, Engineering and Technical: Reproduction,

Requirements for (Oct. 1, 1994), § 6.3.22 ("Standards are documents that establish engineering and technical limitations and application for items, materials processes, methods, designs, and engineering practices.").

Finally, the pre-Defense Procurement Reform Act regulations identified "process sheets, manuals, technical reports, catalog item identifications and related information and computer software documentation," as types of technical data. 32 C.F.R. § 7-104.9(a) (1977). "[P]rocess sheets" are clearly technical in nature. They "are prepared by the production process planners who reduce the dimensioning on the part to operational sequences with the material specified so that shop people who operate the machinery, and cannot read engineering drawings, can understand how the part is to be processed." Electro-Methods, Inc. v. United States, 7 Cl. Ct. 755, 765 n.9 (1985); see also To Lockley Mach. Co., B-128810, 1956 WL 1311, at *1–2 (Comp. Gen. Dec. 28, 1956) ("[P]rocess sheets indicat[e] how [a contractor] intend[s] to manufacture the item" and demonstrate whether a contractor is "capable of producing the [item] in accordance with the applicable drawings and specifications.").

Finally, a "[c]atalog item identification" is a determination of an item's classification within the Federal Catalog System.[16] The classification is based on "[i]tem identification data," which is "data that describe the essential physical characteristics of the item and reference data that relate the item to other identifying media (such as manufacturers' part numbers, identified blueprints, suppliers' catalogs, or the like)." 41 C.F.R. § 101-30.101-12. Vendor lists, again, are not designed to classify the parts listed based on their physical or functional characteristics; they merely provide a record of purchases.

In short, all of the examples of technical data cited in the prior regulations consist of information that—unlike the vendor lists—relate to the design of an item or process, how an item was manufactured or assembled, or its physical and functional requirements. The information on the vendor lists, on the other hand, concerns the procurement of finished parts. The information on the lists cannot be used to design, manufacture, operate or reproduce a part, as could a drawing, technical manual, or standards and specifications.

Notwithstanding the foregoing, the government argues that the vendor lists would have been considered technical data under the prior regulations because those regulations stated that: (1) technical data "may, for example, document research, experimental, developmental or engineering work, or be usable or used to define a design or process or to procure, produce, support, maintain, or operate materiel," Def.'s Mot. at 30 (emphasis added) (quoting 48 C.F.R. § 227.401 (1984)); and (2) "the Government had unlimited rights in: '[t]echnical data pertaining to end items, components or processes, prepared or required to be delivered under any Government contract or subcontract, for the purpose of identifying sources, size, configuration, mating and attachment characteristics, functional characteristics and performance requirements,'" Def.'s Resp. at 7 (quoting DoD FAR Supplement, 49 Fed. Reg. 38,577 (Oct. 1,

---

[16] The Federal Catalog System is "the single supply catalog system designed to uniformly identify, classify, name, describe, and number the items of personal property used by the Federal Government by providing only one classification, one name, one description, and one item identification number for each item of supply." 41 C.F.R. § 101-30.101-7.

1984)). The government's argument is logically flawed. The fact that some information that is of a technical nature (e.g., engineering drawings) can be used to identify sources, and procure parts for or maintain the weapons system, does not mean that all information that can be used for those purposes is technical data. The Court concludes, therefore, that the prior regulations provide support for the conclusion that the information on the vendor lists is not technical data.

### D.        The Regulatory Objectives

Finally, the purposes that animate the technical data regulations are not served by extending the definition of technical data to the information on the vendor lists. See Kisor v. Wilkie, 139 S. Ct. 2400, 2415 (2019) (in interpreting a regulation, the Court should look at its "text, structure, history, and purpose").

Beginning in the 1940s, and in the decades that followed, technical data policy was implemented through DoD issuances. In those issuances, DoD endeavored to implement policies that balanced the interests of individual defense contractors in protecting their trade secrets and the interests of the government in promoting competition. See Cubic Def. Applications, Inc., ASBCA No. 58519, 18-1 BCA ¶ 37,049 (describing the history of regulations regarding technical data).

In 1984, in response to "public outrage over inflated and excessive prices being charged the government for sole-source, spare-parts procurements," Congress, as noted, entered the field with the passage of the technical data provisions of the Defense Procurement Reform Act, Pub. L. No. 98-525, 98 Stat. 2492. See id. (citing H.R. Rep. No. 98-690, at 10–12 (1984); 39 Fed. Cont. Rep. (BL) No. 25, at 1183 (Jun. 20, 1983)). That year, a congressional conference committee explained that "one of the keys to solving the problem of excessively priced spare parts is to ensure that the United States will be able to reprocure such items competitively." H.R. Rep. No. 98-1080, at 318 (1984) (Conf. Rep.). In its view, there was "[a] significant constraint on the government's ability" to do so, "because of restrictions on the government's right to release the technical data that would allow other companies to manufacture an item." Id.

Of course, "[c]ontractors who sell to the Government want to safeguard their data to prevent exploitation by their competitors and retain a competitive advantage." Donna C. Maizel, Trade Secrets and Technical Data Rights in Government Contracts, 114 Mil. L. Rev. 225, 227 (1986). But "[i]f only one source has the requisite expertise and technical data to supply an item, the item must be procured on a sole source basis" at inevitably higher prices. Id. at 228. It is for that reason that in the Defense Procurement Reform Act, Congress codified the rules by which the government can secure licenses in technical data so that it can share the data more broadly. See Maizel, supra, at 270.

Those policy considerations are not implicated here. Raytheon has an interest in protecting the confidentiality of information that it has gleaned through its processes for selecting qualified and reliable parts suppliers for complex weapons like the Patriot Missile system. See App. to Pl.'s Cross-Mot. at 2–3 (Loomis Decl. ¶¶ 4–6 (stating that Raytheon has a proprietary process for identifying both authorized suppliers and those providing the highest quality products and services)). But the government's interests in robust competition are not

threatened by restrictions on the disclosure of the vendor lists as they would be, for example, by restrictions on the use and disclosure of Raytheon's engineering drawings. Raytheon's competitors do not need the vendor lists to compete for an award, and the government does not need the lists to find qualified suppliers. Armed with the drawings, specifications, and other information that is truly technical in nature, the government could find and qualify its own suppliers. See id. at 72 (Andrade Decl. ¶ 5 (stating that "[t]here are many suppliers in the marketplace that can build . . . or supply parts that meet design specifications" and that "using technical drawings and technical specifications, the Government (or another contractor) [could] procure parts from multiple sources")); App. to Def.'s Mot. at 892 (Lococo Dep. 44:7–12 (agreeing that vendor lists "mak[e] it easier to find a supplier" but are "not necessary to actually find a supplier")).

In fact, the Defense Logistics Agency, the entity primarily responsible for procuring parts for the Patriot weapons system, does not use Raytheon's vendor lists at all. Instead, it relies on its "own verification/qualification process" for sourcing parts. Id. at 902 (Lococo Dep. 83:8–84:4); id. at 209 (Lococo Decl. ¶ 3 (stating that the Defense Logistics Agency "buys [Patriot] part[s] using their own verification and qualification process," rather than Raytheon's vendor lists)).

It is telling that Army engineers at Letterkenny Depot also once used their own process for procuring parts by qualifying vendors locally. Id. at 209–10 (Lococo Decl. ¶¶ 4–6 (explaining that engineers previously provided potential vendors with a part's engineering drawing in order to determine whether the vendor could supply the part)); id. at 899 (Lococo Dep. 73:5–13). They were, however, doing so "with limited resources, and to varying degrees of success." Id. at 209 (Lococo Decl. ¶ 2). When "a serious quality issue arose" in 2014, the engineers were directed to use the Raytheon vendor lists. Id. (Lococo Decl. ¶ 2). Using the list of vendors Raytheon had assembled was cheaper and more reliable. Id. (Lococo Decl. ¶ 3 (observing that securing parts locally "is very taxing on [Letterkenny Depot's] limited resources")); id. at 209–10 (Lococo Decl. ¶ 4 (explaining that "[t]he prior process for buying parts was very cumbersome and time consuming")). But providing the Army (or potential competitors) with a quicker and less resource-intensive way to identify suppliers is not comparable to the imperative of affording a competitor access to technical data without which it could not compete for the contract. The fact that the interests of the government in securing licenses to use the vendor lists are not squarely within those that the technical data regulations were designed to promote, fortifies the Court's conclusion that the information on the lists is not technical data.

## CONCLUSION

For the reasons set forth above, the Court concludes that the information on Raytheon's vendor lists is not technical data within the meaning of the applicable regulatory provisions. Accordingly, the government's motion for summary judgment as to Counts III and IV, ECF No. 59, is **DENIED** and Raytheon's cross-motion for summary judgment, ECF No. 71, is **GRANTED-IN-PART** (as to Counts III and IV of the Complaint). Counts I, II, and V of Raytheon's Complaint, ECF No. 1, are **DISMISSED** as moot.

The government's first, second, and third motions for leave to file additional exhibits, ECF Nos. 86, 98, and 116, are **GRANTED**. The government's motion for leave to file notice of

additional authorities, ECF No. 115, is likewise **GRANTED**. The government's alternative motion for summary judgment regarding Count V, ECF No. 108, is **DENIED** as moot.

Given all of the foregoing, and because this Opinion adjudicates the entirety of Plaintiff's Complaint and the parties' respective dispositive motions, the Clerk shall enter judgment accordingly. Each party shall bear its own costs.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Chief Judge